UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Executive Air Taxi Corporation, ) | | |
| a North Dakota Corporation, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | Case No. 1:04-cv-56 | |
| ) | | |
| City of Bismarck, North Dakota, a ) | | |
| municipal corporation; Mark Fetch; ) | | |
| Dr. Steven J. Scherr, OnStar ) | | |
| Management Inc.; Timothy J. Thorsen, ) | | |
| Airport Operations Manager; Gregory ) | | |
| B. Haug, Airport Manager; Robert H. ) | **MEMORANDUM AND ORDER** | |
| Simmers, Simson Investment Company; ) | **GRANTING MOTION FOR** | |
| Bryce Hill, City Commissioner with ) | **SUMMARY JUDGMENT** | |
| Airport Portfolio; William Sorenson, ) | | |
| Former Mayor; Cook Leasing, Inc.; ) | | |
| Michael Aarested, Aircraft Management ) | | |
| Services dba Aircraft Maintenance ) | | |
| Services; Alan Sauter; Capital Aviation; ) | | |
| William Wocken, City Administrator, ) | | |
| City of Bismarck, ) | | |
| ) | | |
| Defendants. ) | | |

Before the Court is Executive Air Taxi Corporation's (EATC) motion for summary judgment on the City of Bismarck's (Bismarck) counterclaim. Bismarck resists the motion. For the reasons explained below the motion is granted.

**I.    BACKGROUND**

Prior to May of 1989, Bismarck was the only fuel vendor at the Bismarck Municipal Airport (BMA) and no fuel flowage fees were collected on retail sales or into-plane airline fuel sales. In May 1989, Bismarck allowed other entities to engage in fuel sales at the BMA,

1

including EATC.  At this time, Bismarck's Airport Department instituted a fuel flowage fee to be remitted by all vendors of fuel, including Bismarck's Flightline Department, at the BMA of $0.05/gallon for retail sales and $0.03/gallon for "certificated scheduled airlines."  Bismarck's Flightline Department and EATC are currently the only two fuel vendors at the BMA and as such they are competitors for fuel sales.  Fuel flowage fees are to be collected by all fuel vendors (Bismarck's Flightline and EATC) and remitted to the Bismarck Airport Department.  The remittances are submitted on a monthly basis. Fuel flowage fees are considered Airport Department revenue and are collected to help pay the cost of developing, operating and maintaining the BMA in accordance with FAA regulations for the Airport to take all reasonable measures to be self-sustaining.  Fuel flowage fee collections vary from year to year and are based on the fuel sales volume for the year.  The fuel flowage fee has not changed since it was instituted in May 1989.

Executive Air sells fuel at the Bismarck Municipal Airport pursuant to a Retail Fueling Permit issued on February 14, 1989.  The Permit states in pertinent part:

> As consideration for this permit for securing the right to dispense aircraft fuels, Permitee shall pay to the City (unless otherwise directed by the Manager) a fuel flowage fee in the amount of three (3) cents per gallon to the City when providing into plane fueling service to certificated scheduled airlines serving Bismarck Municipal Airport. Permittee shall pay five (5) cents per gallon to the City for all other fueling services Permittee provides (including, but not limited to fuel pumped by Permittee into owned or controlled aircraft at Bismarck Municipal Airport).
>
> This fuel flowage fee shall be subject to renegotiation between the City and the Permittee from time to time, throughout the length of this permit.

The Permit does not define the term "certificated scheduled airline."  Bismarck argues this phrase means passenger airlines.  EATC has never approached the City in an attempt to

renegotiate the rate set forth in the Retail Fueling Permit.

Paul Vetter, EATC's general manager, testified at his deposition that EATC was charging the lower $0.03/gallon fuel flowage fee to non-airline customers, particularly the Department of Defense. When the City of Bismarck provided fueling services to the Department of Defense it paid a $.05 flowage fee. EATC also charges UPS and FedEx the $.03 fuel flowage fee. EATC argue that the Code of Federal Regulations relating to airlines support its belief that freight hauling airlines sucha s UPS and FedEx qualified as "certificated scheduled airlines." See 14 CFR 119.5 and 135. Bismarck has charged $.03 fuel flowage fee to "Signatory Air Carriers" such as Evergreen International. Evergreen had a contract to haul U.S. mail but no longer operates at the BMA. "Signatory Air Carrier" status is not mentioned in the Permit.

EATC was notified of the City's position regarding the fuel flowage fee rate in January 1990. This was accomplished in a letter sent by Airport Manager, David C. Miller, to EATC Comptroller, Callen Cermak, dated January 16, 1990. The letter states as follows:

> I see on your December, 1989 fuel flowage fee report that you have included intoplane gallons at .03.
>
> I was not aware that Executive Air taxi was fueling any of the certificated scheduled airlines serving Bismarck Airport. These include Big Sky Airlines, Northwest Airlines, Continental Airlines, and Delta Airlines. (See enclosed page 3 of your permit.)
>
> Please advise.

EATC never responded to the letter. Bismarck states that it believed after the letter was sent by that EATC thereafter complied with the flowage fee collection requirements. Bismarck claims EATC was well aware of the customers it could charge the $.03 flowage fee pursuant to the letter.

3

EATC argues Bismarck should have known EATC was charging $.03/gallon to certain carriers due to fuel flowage fee reports EATC filed with Bismarck. These fuel flowage reports only indicate total fuel sales without any indication as to what fuel flowage fee ($.03/gallon vs. $.05/gallon) is being charged to a particular carrier. Sample fuel flowage fee reports have been submitted by the parties. Bismarck states that the fuel flowage reports were not detailed enough to allow them to determine whether the appropriate rates were being charged.

The Permit allows Bismarck to obtain additional information regarding fuel sales from Permittee's should it wish to do so. Paragraph 8(D) of the Permit states as follows:

> At the time of the payment of the fuel flowage fees, or within a reasonable time thereafter, Permitteee may be required to, and if so required, shall furnish all copies of invoices, delivery tickets and other records showing the amount of fuel purchased and dispensed during the period for which fuel flowage fee payment is made.

Bismarck sought leave to amend its Answer and assert a Counterclaim alleging breach of the permit and failure to pay fuel flowage fees on June 22, 2005. The Counterclaim was filed October 3, 2005. The Counterclaim alleges breach of the permit from 1989 to the present.

## II.     STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999). A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.    ANALYSIS

#### A.    STATUTE OF LIMITATIONS

EATC argues that Bismarck's counterclaim is time barred. All agree that the applicable statute of limitations for a breach of contract action as stated in the counterclaim is six years. N.D.C.C. § 28-04-16(1). A claim for breach of contract accrues when the wrongful act giving rise to the cause of action occurs. Wells v. First American Bank, 598 N.W.2d 834, 837 (N.D. 1999). However, the discovery rule applies to contract actions. Id. at 838. "The discovery rule postpones a claim's accrual until the plaintiff knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury." Id. at 838. When the facts are not in dispute, the question of when a claim accrues is properly decided by the court. Id. at 837. An objective standard is used to determine knowledge with the focus upon whether the plaintiff was aware of facts that would put a reasonable person on notice that a claim exists. Id. at 838. A

plaintiff's subjective beliefs are not to be considered. Id.

The facts relevant to the determination of the statute of limitation issue are largely undisputed. The letter dated January 16, 1990, from Bismarck to EATC aptly demonstrates Bismarck's knowledge of the problem. Bismarck admits this much. The letter asks for a response but none was ever received. Bismarck argues that it assumed EATC was in compliance with its interpretation of the Permit following the letter. Such assumptions are not reasonable, especially when one considers Bismarck knew there were problems in 1990 and EATC failed to respond to Bismarck's letter. Despite the clear authority under the permit to obtain additional information regarding the fees collected, Bismarck took no action for 16 years to verify EATC's compliance. The discovery rule demands reasonable diligence. Bismarck failed in this respect and in doing so the statute of limitations has run for all claims which accrued prior to June 22, 1999, which is six years from the date on which Bismarck sought leave to assert a counterclaim.

### B.     FAILURE TO STATE A CLAIM

EATC argues Bismarck's complaint fails to state a claim upon which relief may be granted and asks that it be dismissed. EATC argues Bismarck has failed to state a claim by failing to assert a breach of the Fueling Permit in terms identical to those used in the Fueling Permit.

The Court has reviewed the counterclaim located in docket entry number 107. The main assertion in Bismarck's counterclaim is that "EATC has improperly paid Bismarck a fuel flowage fee of only three (3) cents per gallon for fuel services provided to entities which do not qualify as certificated scheduled airlines." Bismarck's Counterclaim at ¶VI.. This reference to "certificated scheduled airlines" is a direct quote from the Fueling Permit. No reference is made

in the counterclaim to the Code of Federal Regulations, passenger hauling airlines, freight carriers, or freight hauling airlines.

As Bismarck correctly points out, all that is required in a complaint is notice pleading. Bismarck has clearly stated a claim.

      C.     ACCORD AND SATISFACTION

EATC argues that the counterclaim should be dismissed based upon the contract principle of accord and satisfaction. An accord and satisfaction is a means of discharging a contract by means other than those stated in the contract. Earthworks, Inc. v. Sehn, 553 N.W.2d 490, 495 (N.D. 1996). The parties must agree to give and receive something along with actual performance of the agreed settlement. Id. The accord is the agreement and the satisfaction is the performance of the agreement. Peterson v. Ramsey County, 563 N.W.2d 103, 105 (N.D. 1997). An agreement evidencing mutual assent, or in other words, a meeting of the minds, is an essential element of any accord and satisfaction. Earthworks, 553 N.W.2d at 495. Whether there has been an accord and satisfaction is usually a question of fact unless reasonable minds could draw but one conclusion from the facts of the case. Id.

Accord and satisfaction is an affirmative defense and the party raising the defense bears the burden of proof. Peterson, 563 N.W.2d 106. Affirmative defenses are waived if not pleaded. Interest of K.B., 490 N.W.2d 715, 717 (N.D. 1992). EATC included the defense in ¶ XI of its answer.

EATC's argument is that they made all their fuel flowage fee payments in a timely fashion, Bismarck accepted all the payments after the January 16, 1990, letter and Bismarck never insisted EATC comply with the permit. However, the only communication between the

7

parties was the aforementioned letter to which EATC did not respond. One sided communication does not evidence mutual assent. The letter cannot reasonably be read as an offer. EATC has not met its burden of proving there was an agreement between the parties to vary the terms of the permit. The court finds reasonable minds could not conclude there has been an accord and satisfaction.

### D.     COURSE OF DEALING/COURSE OF PERFORMANCE

EATC argues it is entitled to summery judgment based upon course of dealing and course of performance which it asserts demonstrate no material dispute exists. In support of its argument EATC states that for sixteen years it has been charging a fuel flowage fee of $.03 per gallon to what it believes to be "certificated scheduled airlines," submitting substantially similar reporting forms, and that Bismarck has been accepting those reports and payments without objection. Bismarck argues that it did object pursuant to a letter dated January 16, 1990, and that it has assumed, until it took the deposition of Paul Vetter in relation to EATC's lawsuit, that EATC was complying with its interpretation of the Permit and definition of "certificated scheduled airlines." The ambiguity of this phrase, which is not defined in the Permit is the genesis of the dispute.

Both parties cite to the Uniform Commercial Code as adopted by North Dakota in support of their arguments. Although the applicability of the UCC to the Permit in question, is debatable, the general provisions of the UCC, which apply to all commercial contracts, are certainly applicable by analogy. See I E. Allan Farnsworth, Farnsworth on Contracts §§ 1.9a & 7.13 (3rd ed. 2004).

Course of performance is defined under North Dakota law as follows.

8

> 1. If the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
>
> 2. The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 41-01-15).
>
> 3. Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

N.D.C.C. § 41-02-15.

Course of dealing is defined under North Dakota law as follows:

> 1. A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> 2. A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing, the interpretation of the writing is for the court.
>
> 3. A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.
>
> 4. The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.
>
> 5. An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.

> 6. Evidence of a relevant usage of trade offered by one party is not admissible unless and until that party has given the other party such notice as the court finds sufficient to prevent unfair surprise to the latter.

N.D.C.C. § 41-01-15.

Course of dealing and course of performance are closely related but distinct concepts. These concepts are applicable in both a UCC and non-UCC context. Herman Oil, Inc. v. Peterman, 518 N.W.2d 184 (N.D. 1994)(UCC); Nat. Bank of Harvey v. Int'l Harvester Co., 421 N.W.2d 799 (N.D. 1988)(non-UCC). Course of dealing relates to previous conduct or transactions between the parties unrelated to the contract in question. Course of performance relates to how the parties, in the context of a contract which calls for repeated performance of some act, have performed the contract in question. See II E. Allan Farnsworth, Farnsworth on Contracts § 7.13 (3rd ed. 2004). The argument presented to the Court, although couched in terms of both course of dealing and course of performance, is in reality a course of performance argument as it relates to how the parties have conducted themselves under the agreement since it was signed in 1989. Bismarck correctly points out that the two parties have no previous course of dealings to look at when analyzing the current dispute.

The purpose of contract interpretation is to find the mutual intent of the parties. Mandan Educ. Assoc. v. Mandan Pub. Sch. Dist. No. 1, 610 N.W.2d 64, 67 (N.D. 2000). The conduct of parties after the formation of the contract and in the course of performance therefore is helpful in determining the meaning of language and in explaining written terms. Herman Oil, Inc., 518 N.W.2d at 189; Nat. Bank of Harvey, 421 N.W.2d at 803. A waiver is the knowing and voluntary relinquishment of a known right. Kessel v. W. Savings Credit Union, 463 N.W.2d 629, 631 (N.D. 1990). "A party who makes an unexplained delay in enforcing his contractual rights

or who accepts performance in a manner different from that required by the contract has been held to have acquiesced to the nonconforming performance made by the other party." Dangerfield v. Markel, 252 N.W.2d 184, 191 (N.D. 1977)(seller's continuing to make deliveries after buyer failed to make one payment waived right to cancel contract for breach); see Shervold v. Schmidt, 359 N.W.2d 361, 363-64 (N.D. 1984)(accepting late payment constituted waiver and prevented seller from cancelling contract for deed).

      The Fuel Permit agreement was entered into in February of 1989. The term of the Permit was twenty years with a provision that either party may cancel the permit upon thirty days notice. The fuel flowage fee was $.03 per gallon for "certificated scheduled airlines" and $.05 for all other fueling services. Certificated scheduled airlines was not defined in the Permit. By the terms of the Permit the fuel flowage fee was subject to periodic renegotiation. The fee has never been changed. EATC submitted the fees it collected along with reports as required on a monthly basis. The Permit allows Bismarck to require EATC to "furnish all copies of invoices, delivery tickets and other records showing the amount of fuel purchased and dispensed. Bismarck has never done this. The record contains two Fuel Flowage reports, one dated January 15, 1990, and another dated June 28, 2005. Both reports clearly show into plane fuel sales at a rate of $.03 per gallon.

      In January of 1990, a letter was sent from Bismarck to EATC questioning the December 1989, fuel flowage report. The letter listed a number of "certificated scheduled airlines," questioned whether EATC was servicing any of these airlines, and asked for EATC to respond. EATC did not respond. Bismarck did absolutely nothing over the next fifteen years to follow up on the matter. Bismarck states it "reasonably assumed" EATC changed its practices after the

11

letter was sent.  The Court finds any such assumption, if it ever existed, to be entirely unreasonable.  Bismarck continued accepting the payments and reports without question.  Bismarck did not ask for more detailed reports.  Bismarck did not cancel the Permit.  Bismarck did not renegotiate the fuel flowage fee.  All these actions are permitted under the permit.

The 1990 letter demonstrates knowledge.  Knowledge is also demonstrated by the fuel reports which clearly show EATC was selling significant amounts of fuel on which it was collecting the $.03 fee.  Continued acceptance of the reports and fees submitted by EATC demonstrates acquiescence.  By its actions, or course of performance, Bismarck has agreed to EATC's definition of "certificated scheduled airline."  In addition, Bismarck's actions in accepting all payments and reports with no investigation or follow-up to its 1990 letter and in light of the monthly reports submitted by EATC demonstrate a pattern of conduct constituting a waiver.  Bismarck's argument that it "reasonably believed" EATC was complying with its definition of "certificated scheduled airline" is simply unbelievable in light the reports submitted by EATC.  No reasonable jury could find otherwise.  Summary judgment is appropriate.

## IV.    CONCLUSION

Accordingly, EATC's motion for summary judgment is **GRANTED**.  Let judgment be entered accordingly.

**IT IS SO ORDERED**.

Dated this 30th day of August, 2006.

/s/ *Patrick A. Conmy*
Patrick A. Conmy, Senior District Judge
United States District Court