**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Executive Air Taxi Corporation, | ) | |
| a North Dakota Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:04-cv-56 |
| | ) | |
| City of Bismarck, North Dakota, a | ) | |
| municipal corporation; Mark Fetch; | ) | |
| Dr. Steven J. Scherr, OnStar | ) | |
| Management Inc.; Timothy J. Thorsen, | ) | |
| Airport Operations Manager; Gregory | ) | |
| B. Haug, Airport Manager; Robert H. | ) | **MEMORANDUM AND** |
| Simmers, Simson Investment Company; | ) | **ORDER GRANTING** |
| Bryce Hill, City Commissioner with | ) | **DEFENDANTS' MOTIONS FOR** |
| Airport Portfolio; William Sorenson, | ) | **SUMMARY JUDGMENT** |
| Former Mayor; Cook Leasing, Inc.; | ) | |
| Michael Aarested, Aircraft Management | ) | |
| Services dba Aircraft Maintenance | ) | |
| Services; Alan Sauter; Capital Aviation; | ) | |
| William Wocken, City Administrator, | ) | |
| City of Bismarck, | ) | |
| | ) | |
| Defendants. | ) | |

---

Before the Court are three motions for summary judgment. The first motion is filed by

the City of Bismarck[1]. The second motion is filed by Robert Simmers, Simson Investment

Company, Michael Aarestad and Aircraft Management Services. The third motion is filed by

Cook Leasing, Inc. Defendants Mark Fetch, Alan, Sauter, Steven Scherr, Robert Simmers,

Simson Investment Company, Michael Aarestad, Aircraft Management Services, and Cook

Leasing, Inc. have joined in the motion filed by the City of Bismarck. Cook Leasing Inc. and

---

[1]The Court has previously ruled that the inclusion of Defendants Timothy J. Thorsen, Gregory B. Haug, Bryce Hill, William Sorenson and William Wocken's names in the caption of this case are mere surplusage as they are or were City officials sued in their official capacity only. Their inclusion in the caption of the Amended Complaint was unnecessary. They are not parties in their personal capacities.

Robert Simmers, Simson Investment Company, Michael Aarestad and Aircraft Management Services have joined in each other's respective motions.  Also before the Court is Cook Leasing's motion for Rule 11 sanctions.

## I.    BACKGROUND

Executive Air Taxi Corporation (EATC) filed this lawsuit May 6, 2004.  An amended complaint was filed August 30, 2004.  The suit alleges that the City of Bismarck (Bismarck) and the other named defendants conspired to discriminate against EATC to put EATC at an economic disadvantage in the provision of aviation services and in doing so violated EATC's due process and equal protection rights under the Fourteenth Amendment and 42 U.S.C. § 1983. EATC contends that Bismarck has not required other service providers at the Bismarck Municipal Airport (BMA) to accept the same lease terms as contained in the EATC lease or maintain the same level of service as EATC.  EATC also complains of unequal enforcement of Bismarck Municipal Code § 10-08-07.

EATC is a North Dakota corporation engaged in the business of providing commercial aeronautical services since 1974.  EATC is a full service fixed base operator (FBO) at the BMA, providing a full range of aeronautical services, including aircraft fueling, aircraft and hangar rental, aircraft maintenance, air ambulance services and maintenance, charter services, and other services to the public.  EATC has been a tenant of the BMA since January 1, 1976, when it entered into a 20-year lease with BMA.  The lease was renewed for an additional 10 years in 1995 and expired on December 31, 2005.  The other aviation/aircraft service providers at the BMA are limited service providers.  Dennis Rohlfs is the president of EATC.

The defendant City of Bismarck (Bismarck), is a municipal corporation organized under the laws of the State of North Dakota. Bismarck is owner and operator of the BMA. During a period from the 1940's until 1988, Bismarck exercised its proprietary exclusive right to sell fuel at the BMA. From and after 1988, Bismarck has authorized other service providers to sell fuel at the BMA. Bismarck provides fueling, towing, hangar rental and storage services, and pilot support services at the BMA. Gregory B. Haug (Haug) is employed by Bismarck as the Airport Manager of the BMA. Timothy J. Thorsen (Thorsen) is employed by Bismarck as the Airport Operations Manager of the BMA. Bryce Hill (Hill) is a Bismarck City Commissioner. William Sorenson is the former Mayor of Bismarck. William Wocken (Wocken) is employed as the City Administrator for Bismarck.

Defendant Mark Fetch is a pilot and flight instructor. Defendant Alan Sauter is also a pilot and flight instructor. Defendant Dr. Steven J. Scherr is the sole shareholder in OnStar Management Inc. (OSM) which leases aircraft. Defendant Robert H. Simmers, through Simson Investment Company, owns a hangar erected upon land leased from the City at the BMA. Defendant Michael Aarestad is a partner with Simmers in another company called Aircraft Management Services, Inc. (AMS). AMS is a limited service provider and leases a hangar from Simson Investment Company. AMS provides aircraft maintenance, aircraft storage, towing, and other services. Cook Leasing Inc. leases aircraft it owns to the general public at the BMA.

Former defendant Capitol Aviation was a limited service provider at the BMA from 1946 to 2003, when it was formally dissolved. Robert K. Watts was the president of Capital Aviation.

### A.     CAPITAL AVIATION

Former defendant Capital Aviation began operations at the BMA in 1946.  Capital

Aviation continuously operated at the BMA from 1946 through 2003.  In 1964, Capital Aviation

entered into a lease with Bismarck at the BMA.  The lease was for an initial term of twenty

years, with an option to extend for one additional ten year term.  Capital Aviation exercised this

option.  Thereafter, Capital Aviation continued the lease on a month to month basis until ceasing

operations.  Capital Aviation leased real property, consisting in part of a 40 foot by 80 foot

hangar which had been built in the 1920's and which did not have running water.

Pursuant to the terms of the Capital Lease, Capital was required to provide the following services

at the BMA:

> 2.  Services to Public.  It is the purpose of this lease, and a material
> obligation and condition thereof to be performed by Lessee, that during the full
> term of 20 years of this lease the Lessee shall furnish during normal business
> hours the following services on demand of the general public:
>
> > (a)     Lessee shall operate a complete flying school consisting of student
> > instruction for private and commercial flying, instrument flying
> > and instrument instructor's rating.
> > (b)     Lessee shall operate and maintain a charter service and will furnish
> > at the minimum a 4 place aircraft.
> > (c)     The Lessee shall service, maintain and repair aircraft and aircraft
> > engines, and aircraft radios and two-way communication systems.
>
> and the Lessee at its option my furnish to the general public the following:
>
> > (a)     Service of sale, disposal, exchange of aircraft, accessories,
> > engines, and related equipment, new and used.
> > (b)     Sprayer aircraft.
> > (c)     Any other services or products related to aviation or electronics not
> > specifically prohibited by Federal, State or City rules and
> > regulations governing the Bismarck Airport.

Pursuant to the terms of the Capital Lease, Capital was charged annual rent of six cents per square foot for improved property (including paved) and two cents per square foot for unimproved property leased. Capital Aviation provided aircraft maintenance, aircraft charter, aircraft and parts sales, avionics services, aircraft storage and towing, and pilot services. Capital Aviation did not sell fuel at the BMA although it did have a permit to do so. Capital Aviation ceased operations at the BMA in 2003. The hangar occupied by Capital Aviation was removed from the BMA property when Capital Aviation ceased operations at the BMA in accordance with the terms of the Capital Lease.

Capital Aviation's hangar did not have restroom facilities. Capital Aviation had an agreement with Bismarck to use bathroom facilities located in a hangar owned by Bismarck and located adjacent to the Capital Aviation hangar. Capital Aviation paid a monthly fee under the agreement.

### B.    EXECUTIVE AIR TAXI CORPORATION

EATC is a corporation organized under the laws of the State of North Dakota having its principal place of business at the BMA. EATC began providing charter services for Basin Electric Power Cooperative at the BMA in 1973 or 1974. At that time EATC did not have its own facility and instead rented space from another service provider at the BMA. EATC entered into a lease with Bismarck in 1976. EATC is a full service fixed base operator (FBO). As a full service FBO, EATC provides a full range of aeronautical services, including aircraft fueling, aircraft and hangar rental, aircraft maintenance, air ambulance service and maintenance, charter service, and other services to the public at the BMA. EATC holds a Part 135 certificate. The named service provider defendants are Part 91 operators. EATC is the only full service FBO on

the BMA.  The other service providers at the BMA provide a more narrow scope of services than EATC does as a full service FBO.  Bismarck and EATC are the only providers of fueling services at the BMA.

On or about January 1, 1976, EATC entered into an Airport Lease with Bismarck for the use of real property on the BMA for an initial term of twenty years with an option to renew the lease for an additional ten years, which option was exercised on June 16, 1995.  The EATC Lease provided for lease payments of two cents per square foot for unimproved property and six cents per square foot for improved real property, with provision for rate increases over time.

By the time the EATC Lease expired in 2005, the lease payments had increased to three cents per square foot for unimproved property and remained unchanged at six cents per square foot for improved property.  EATC paid $898 per year in lease payments to BMA from 1976 to 1990, and lease payments of $1,357 per year from 1990 to the lease termination on December 31, 2005.

Under the terms of the EATC Lease, EATC was required to construct a 100 foot by 100 foot structure for shop, office and lobby space to be used by EATC at the BMA.  EATC complied with this lease requirement.

The EATC Lease provided further that EATC, the Lessee, shall provide specified services to the public during the term of the lease, as follows:

> (a)    Lessee shall operate a complete flying school consisting of student instruction for private and commercial flying, instrument flying and instrument instructor's rating.

> (b)    Lessee shall operate and maintain a charter service and will furnish at the minimum a four place aircraft.

(c)     The Lessee shall service, maintain and repair aircraft and aircraft engines.

(d)     Lessee shall be fully operational within eighteen months (18) as described in this airport lease agreement in 3(a), 3(b), and 3(c) and qualify as a Federal Aviation Agency approved Repair Station.

And the Lessee at its option may furnish to the general public the following:

(a)     Service, sale, disposal, and exchange of aircraft, aircraft accessories, aircraft engines, and related equipment, new and used.

(b)     Sprayer aircraft.

(c)     Any other services or products related to aviation or electronics not specifically prohibited by Federal, State or City rules and regulations governing the Bismarck Airport.

In 1988 EATC filed an informal complaint with the Federal Aviation Administration (FAA) alleging the fuel flowage fee was discriminatory.  The FAA agreed with EATC and ordered that the City charge the fee to itself and separate its fuel service operations from its other airport activities to prevent the City from cross-subsidizing the fuel operation.

In April of 1991, EATC filed a formal complaint alleging the City was not complying with the requirements of the earlier FAA decision.  A second formal complaint was also filed adding additional grievances.  The complaints alleged economic discrimination in violation of the Federal Aviation Act, 49 U.S.C. § 1301, et seq., and the Airport and Airway Improvement Act, 49 U.S.C. § 2201 et seq.  In its decision the FAA rejected EATC's argument that Bismarck forced EATC to accept the EATC Lease terms and instead concluded the EATC Lease was the result of an arms-length negotiation.  The FAA concluded the terms of the EATC Lease were reasonable and in accordance with Bismarck's policies at the time the EATC Lease was entered into.  The FAA determined Bismarck did not discriminate against EATC, noting Capital Aviation's prior lease also required the provision of multiple aeronautical services at the BMA.

7

The FAA noted it was proper for Bismarck to adjust its standards over time to reflect the changing needs of the public and to accommodate changes in the level of commercial aeronautical services available at the BMA.

Although the EATC Lease required EATC to perform various aeronautical services at the BMA, the FAA determined such requirements were not unreasonable given the level and types of activity at the BMA when the lease was entered into nor were they mandatory as there was no evidence EATC had objected to the lease terms or that the lease was not the product of arms-length negotiation. The FAA noted Capitol Aviation was also required to provide multiple services at the BMA under a lease predating the EATC Lease.

The FAA found the City was complying with its order and had not violated the Federal Aviation Act, 49 U.S.C. § 1301, et seq., and the Airport and Airway Improvement Act, 49 U.S.C. § 2201 et seq. This decision, in its entirety, was upheld in a Memorandum issued by the D.C. Circuit Court of Appeals. Executive Air Taxi v. Federal Aviation Admin., No. 93-1478 (D.C. Cir. 1994). The FAA does not require, but does encourage, the adoption of minimum standards.

EATC leased additional property at the BMA for use as a bulk fuel storage facility pursuant to a lease, effective September 25, 1989, (EATC Fuel Farm Lease) The EATC Fuel Farm Lease has a twenty year term, expiring on September 24, 2009. The leased premises comprise 7,650 square feet with an initial rental charge in 1989 of two cents per square foot, with provision for rent adjustments over time. In 1989, Bismarck issued EATC a permit to sell fuel on the BMA in accordance with the terms of a fueling permit. Bismarck and EATC are the only fuel providers at the BMA. On June 6, 1989, a referendum was held in the City of

Bismarck on the issue of whether Bismarck should continue to sell aviation fuel at the BMA. The residents of Bismarck determined Bismarck should continue to sell fuel at the BMA.

Pursuant to an Assignment of Lease and Consent to Assignment between First Southwest Bank and EATC dated May 22, 1998, EATC acquired the use of an additional parcel of land at the BMA comprising approximately 34,500 square feet, and containing a hangar comprising approximately 17,056 square feet, with an additional 4,992 square feet of office, lobby and lounge space. The Assigned 1994 Lease has a twenty (20) year term commencing on July 1, 1994, and ending on June 30, 2014. The Assigned 1994 Lease provides an option to extend the lease for an additional term of ten (10) years.

The 1976 EATC Lease terminated on December 31, 2005. EATC entered into a new one-year lease with Bismarck effective January 1, 2006 (New EATC Lease). Bismarck believes the New EATC Lease is in accordance with minimum standards approved by Bismarck on December 14, 2004 and effective as to EATC on January 1, 2006. The process of implementing minimum standards at the BMA was in place before EATC initiated this lawsuit. Dennis Rohlfs served on Bismarck's minimum standards committee. EATC is unhappy with the minimum standards adopted by Bismarck on December 14, 2004.

On March 24, 2006, Dennis Rohlfs contractually agreed to sell all of his interest in TJ Holding Company to Brockway Moran & Partners. EATC is a wholly owned subsidiary of T.J. Holdings. T.J. Holdings is a North Dakota corporation. Closing on the sale occurred on June 7, 2006. Rohlfs was president of T.J. Holdings up until he sold his interest. The sales agreement states Rohlfs will conduct the prosecution of this lawsuit, but will not settle without the consent of Brockway Moran. Rohlfs will remain the president of EATC during the prosecution of this

lawsuit and receive any potential proceeds as a result of the conclusion of the lawsuit.  Rohlfs
will bear all ongoing legal costs associated with the lawsuit and will indemnify EATC for any
adverse consequences resulting from the lawsuit.

### C.    WAY-POINT AVIONICS, INC.

Way-Point Avionics, Inc. (Way-Point) is a corporation organized under the laws of the
State of North Dakota.  Way-Point entered into a lease with Bismarck dated November 1, 1983
for .32 acres of land with an existing structure at the BMA.  The Way-Point 1983 Lease was for
an initial period of twenty years with options to extend for two additional ten year periods.  The
Way-Point 1983 Lease required annual lease payments of ten cents per square foot.  Way-Point
Avionics was permitted to make improvements on the leased premises to be used solely for
avionics repairs and offices related to aeronautical services.  Under the terms of the Way-Point
1983 Lease, Way-Point Avionics was permitted to remove any improvements to the property at
the termination of the lease, and if not removed, ownership of said improvements would pass to
Bismarck.

Way-Point Avionics exercised its first ten year option under the Way-Point 1983 Lease
by entering into a Restatement Of The Ground Lease Agreement (Way-point 2003 Lease) with
Bismarck for a term commencing November 1, 2003 and expiring October 31, 2013.  Pursuant to
the Way-Point 2003 Lease, Way-Point's annual rent for the first year (November 1, 2003 through
October 31, 2004) was $2,172, or approximately $.16 per square foot, with annual rent increases
thereafter.  Pursuant to the Way-Point 2003 Lease, the leased premises may be used by Way-
Point or its sub-lessees engaging in aeronautical activities in accordance with Bismarck's
recently adopted minimum standards.  Way-Point is also authorized to use the leased premises as

a private hangar.  Pursuant to the Way-Point 2003 Lease, Way-Point is responsible for snow removal on the leased premises.

Way-Point Avionics operated an avionics repair shop at the BMA from approximately November of 1983 until October of 2005.  Way-Point Avionics continues to sublease office, lobby and lounge space to Aircraft Management Services, Inc.

### D.    BASIN ELECTRIC POWER COOPERATIVE

Basin Electric Power Cooperative (Basin Electric) is a cooperative association organized under the laws of the State of North Dakota.  Pursuant to a Lease Agreement dated September 2, 1986, restated pursuant to a Ground Lease Agreement dated December 30, 1999 (Basin Lease), Basin Electric leased a .92 acre (40,044 sq. ft.) parcel from Bismarck at the BMA for an annual rent of $10,011.00 (twenty five cents per square foot), subject to periodic adjustments.  The Basin Lease is for a term of fifteen years, commencing September 1, 1999.  Basin Electric constructed certain initial improvements on the leased property, including 11,320 square feet of offices, lobby and general aviation hangar space, pursuant to the 1986 lease.  The Basin Lease provides Basin Electric must remove any improvements from the property upon lease termination unless Bismarck's written permission is obtained to leave the improvements on the property.  If any such improvements are not removed upon lease termination, with Bismarck's permission, ownership of the improvements will pass to Bismarck.  Pursuant to the Basin Lease, Basin Electric was authorized to occupy and use the leased premises for the parking, storage, servicing, repair and maintenance of aircraft owned or operated by Basin Electric, its subsidiaries, affiliates, approved sublessees; and administration and operations offices, shops, and lounges used in connection with said purposes and for no other purpose whatsoever.

11

Basin Electric does not provide commercial aeronautical services to the general public.
Instead, Basin Electric utilizes the leased premises solely for its own use.  Prior to December 14,
2004, Basin Electric would occasionally lease extra hangar space it had available to the general
public.  Basin Electric discontinued providing this limited commercial aeronautical service upon
the enactment of minimum standards by Bismarck on December 14, 2004.

**E.      ROBERT H. SIMMERS, D/B/A SIMSON INVESTMENT COMPANY**

In 1990, defendant Robert H. Simmers (Simmers) incorporated Simson Investment
Company, (Simson Investment) under the laws of the State of North Dakota.  Simson Investment
was formed for the purpose of owning structures built upon leased premises at the BMA.

Prior to establishing Simson Investment in 1990, Simmers was employed by EATC in the
late 1980's as the chief pilot of its air taxi operation.  Defendant Michael Aarestad (Aarestad)
purchased an eighteen percent interest in Simson Investment in late 2004, with the balance of
Simson Investment being owned by Simmers and his wife.  Simson Investment owns two
buildings erected upon land leased from Bismarck at the BMA.  These two buildings were built
in three building projects: 1990-91 original hangar; addition to hangar in 2002-2003; additional
separate hangar in 2005.  Pursuant to the Simson 1990 Lease, Simson leased an area measuring
approximately 107 feet by 100 feet (10,700 square feet) for the express purpose of constructing a
hangar measuring 100 feet by 100 feet for the purpose of aircraft storage.  Annual rent under the
Simson 1990 Lease was based on ten cents per square foot, with provision for rent increases over
time.

The Simson 1990 Lease was restated in May of 2003 pursuant to Restatement of the
Ground Lease Agreement (Simson 2003 Lease).  A restatement of the Simson 1990 Lease was

necessary to facilitate expanded hangar facilities and support space comprising approximately 6,000 square feet of heated hangar space with a concrete floor including office, toilet and washroom facilities, a paved parking lot for 20 vehicles and installing a concrete floor in the existing 10,000 square foot hangar.  Total square footage leased to Simson increased from 10,700 square feet under the 1990 lease to 35,328.7 square feet under the 2003 lease.

The Simson 2003 Lease adopted the original twenty year term of the 1990 lease, plus added options to extend the lease by two additional ten year terms.  Rent was increased under the Simson 2003 Lease as follows: annual rent for the original 10,700 square foot parcel was increased from $1,070 (ten cents per square foot) to $1,259.35 (approximately twelve cents per square foot), and annual rent for the 24,628.7 square foot addition was set at $6,694.08 (approximately twenty-seven cents per square foot).  Simson Investment built the improvements required under the Simson 2003 Lease.

Simson Investment's construction of the expanded hangar facilities in 2003 began prior to the execution of the Simson 2003 Lease.  EATC alleges it was improper for Bismarck to permit Simson Investment to commence construction of the expanded hangar facilities in 2003 prior to execution of the Simson 2003 Lease.  The Simson 1990 Lease was still in effect at the time construction of the expanded hangar facilities began in 2003.  Bismarck explains that the Simson 2003 Lease was not executed prior to the commencement of construction of the expanded hangar facility was due to ongoing negotiations between Bismarck and Montana-Dakota Utilities (MDU) relative to MDU's proposed plan to expand its hangar facilities on property neighboring the site of Simson Investment's expanded hangar facility.  Bismarck needed to determine the

impact of MDU's proposed expansion upon boundary lines between the Simson Investment and MDU properties at the BMA before executing the Simson 2003 Lease.

The Simson 2003 Lease was executed after the commencement of construction. Once the boundary lines of the premises had been defined and the Simson 2003 Lease was executed, Simson Investment paid Bismarck rent retroactive to the effective date of the Simson 2003 Lease.

Simson executed a sublease with AMS on June 1, 2003. This sublease was later superceded by a sublease dated February 6, 2006. Bismarck never gave formal approval to the 2003 sublease although it contends it did not need to do so. Bismarck did give formal approval to the 2006 sublease.

On April 13, 2005, Simson Investment and Bismarck entered into Amendment 1 to the Simson 2003 Lease. Pursuant to the Simson 2003 Amended Lease, Simson Investment leased an additional 22,251.3 square feet of land at the BMA, bringing the total leased area to 57,580 square feet. Simson Investment was also authorized to, and did, construct a 10,000 square foot hangar addition to its existing facility at the BMA. Simson Investment agreed to pay Bismarck, as annual rent for the additional leased premises, $6,319.32 (average of twenty-eight point four cents ($.284) per square foot).

Simson Investment has continuously leased the 100 foot by 100 foot original hangar structure constructed pursuant to the Simson 1990 Lease to tenants for the storage of aircraft and continues to do so today. Simson Investment does not provide aircraft fueling, aircraft rental, sales or leasing, aircraft maintenance or repair, air ambulance service or maintenance, charter service, commercial flying instruction, or aircraft towing. Simson Investment leases the 2003

addition (6,000 square feet) to Aircraft Management Services Inc. (AMS). Simson Investment

leases the 2005 expansion to other tenants for aircraft storage.

### F.    AIRCRAFT MANAGEMENT SERVICES

In 1990, Simmers incorporated AMS in North Dakota. Defendant Michael Aarestad

(Aarestad) purchased a fifty percent interest in AMS in 2002. There is no such company as

Aircraft Maintenance Services as listed in the caption to this action. Before going into business

with Simmers, Aarestad had been employed by EATC for approximately fifteen years as EATC's

director of maintenance. AMS began leasing hangar space from Simson Investment at the BMA

in 2003. AMS leases the 2003 addition to the Simson Investment hangar. Simson Investment

and AMS have their corporate offices in space leased from Way-Point Avionics, Inc. which is

located in a separate building on the BMA. AMS leases customer lobby and lounge space, as

well as restrooms for use by its customers in the Way-Point Avionics building.

AMS is a limited service provider at the BMA, providing pilot services, flight instruction,

aircraft maintenance, aircraft sales and leasing at the BMA. AMS does not provide aircraft

fueling, air ambulance service, or charter service. AMS provides pilots to fly, and maintenance

services for, aircraft owned or controlled by customers such as Dakota Eye Institute, PrimeCare

Clinics, Pathology Consultants, Northern Laboratories, North Dakota State Game & Fish, and

North Dakota Department of Transportation. With the exception of defendant Al Sauter, who is

an independent contractor pilot for AMS, the remainder of the pilots utilized by AMS are direct

employees of AMS. Procedurally, AMS schedules the pilots to fly aircraft owned or leased by

the customer. If the aircraft is stored in a Bismarck owned hangar or if Bismarck will be selling

fuel for the flight, Bismarck, upon request, tows the aircraft from the hangar and parks the

aircraft in front of the Bismarck terminal. The AMS provided pilot then instructs Bismarck as to the amount of fuel to place in the aircraft, performs required pre-flight inspections, and generally prepares the plane for the scheduled trip. The passengers are then picked up at the BMA arrival and departure building for the flight. The owner or lessee of the aircraft pays for the fuel placed in the aircraft.

AMS provides pilot services at the BMA and occasionally contracts to provide pilots to fly aircraft owned by Cook Leasing. AMS is a Part 91 operator and does not hold a Part 135 certificate. Part 91 regulations apply to all operators of aircraft, whether commercial or private. Part 135 regulations govern charter or air taxi services. If an applicant qualifies as a Part 135 operator, the FAA issues that operator a Part 135 certificate. The determination of whether a particular service provider qualifies as a Part 135 operation is made by the FAA. Bismarck does not actively investigate whether various aviation service providers at the BMA are Part 91 or Part 135 operators.

In approximately 1993 and/or 1994, EATC provided aircraft towing services for Simson Investment at the BMA. EATC discontinued providing towing services to Simson Investment on the basis it was not economically feasible for EATC to continue to do so. Bismarck was the only other entity at the BMA which offered aircraft towing services when EATC discontinued providing towing services to Simson Investment. Simson Investment entered into a verbal agreement with Bismarck whereby Bismarck would provide aircraft towing services for Simson customers on a price per tow basis. In the late 1990's, this was changed to a flat monthly fee of $300. Bismarck currently charges Simson Investment a flat monthly fee of $450 for aircraft towing services.

Aeronautical service providers who have leases with the BMA have permission to operate motor vehicles on the BMA, subject to certain security requirements. Such motor vehicles must bear the corporate colors, lettering or logo of the service provider while operating on the general aviation operations area and other areas as necessary or required (ramp area ). A motor vehicle which operates in a movement area, which includes aircraft taxi-ways and run-ways, must also be equipped with either a flag or flashing beacon during the day time, or a beacon at night time and during periods of limited visibility. Furthermore, any vehicle which operates in a movement area  must also be equipped with communications equipment to facilitate communication with the traffic control tower at the BMA.

### G.    ONSTAR MANAGEMENT

The defendant Dr. Steven J. Scherr (Scherr) is the sole shareholder of OnStar Management, Inc. (OSM). OSM owns two aircraft which are stored at the BMA. OSM leases its aircraft to medical clinics located in Bismarck, North Dakota. The medical clinics retain the services of one or more pilots to operate the leased OSM aircraft. Aircraft leased from OSM have often been piloted by both Allen Sauter and Mark Fetch who were retained by the leasing clinic. OSM operates at the BMA as a FAR Part 91 operation and does not hold a FAR Part 135 certificate. OSM owned aircraft are stored in hangar space leased from Bismarck.

OSM does not operate a commercial air transportation business or air charter business at the BMA. OSM does not provide commercial aeronautical services to the general public and does not provide aircraft fueling, hangar rental, aircraft maintenance and repair, aircraft sales, air ambulance service or maintenance, charter service, commercial flight instruction or aircraft towing.

OSM does not provide air transportation service for doctors from the Primecare Group, including Mid Dakota Clinic and Bone & Joint. Instead, OSM leases aircraft to PrimeCare Group, which in turn privately contracts with pilots, typically Allen Sauter, to fly the leased aircraft. Air transportation for the doctors of the PrimeCare Group was previously provided by EATC.

### H.    MARK FETCH

Defendant Mark Fetch (Fetch) is currently an employee of Pinnacle Airlines, and is based out of Minneapolis. Prior to his employment with Pinnacle Airlines, Fetch was employed by Mesaba Airlines and was based out of Detroit, Michigan and was so employed from September 12, 2005 to October 14, 2005. From December, 2004 to August, 2005, Fetch was employed by Aircraft Management Services, Inc. (AMS) to provide pilot services.

From October 2003 to December 2004 Fetch was an independent pilot who contracted with clinics in Bismarck, North Dakota to provide pilot services for individuals associated with the contracting clinics. The airplanes utilized when transporting the individuals associated with the clinics were leased from OSM.

From September 2003 to December 2004 Fetch provided flight instruction services and was based out of the Mandan Municipal Airport. Fetch would occasionally meet his flight instruction students at the BMA arrival and departure building. He hangared his aircraft and operated his flight instruction service from the Mandan Municipal Airport.

In August of 2003 Fetch placed a one page letter-sized advertisement for his flight instruction service on a bulletin board at the BMA. The advertisement was removed from the bulletin board by Bismarck shortly after Bismarck was advised of its presence.

18

## I.    ALLEN SAUTER

Defendant Allen Sauter (Sauter) has been flying aircraft since 1957 and has been flying

commercially as a professional pilot since 1964.  Sauter does not provide aircraft fueling, aircraft

rental, sales or leasing, hangar rental, aircraft maintenance and repair, air ambulance service and

maintenance, or aircraft towing at the BMA.  Sauter provided flight instruction at the BMA

part-time from 1964 to 1967 and then again from 1998 through 2003.  Independent flight

instructors have been providing flight instruction at the BMA since at least 1964 and continue to

do so to this day.  Those independent flight instruction pilots typically have not had any facilities

on the BMA.

When Sauter provided flight instruction, as well as crop dusting services, he owned his

own plane and his flights originated from either his own private airstrip located at his home

approximately two miles east of Bismarck, or from the Mandan airport.  During this time period,

Sauter would occasionally pick up his flight instruction students at the BMA.

From 1998 through 2005, most of Sauter's work involved contract pilot services wherein

he would fly other peoples' aircraft.  Sauter flew part-time for Montana-Dakota Utilities and

other local companies on an on-call basis.  In 2000 and 2001, Sauter was employed part-time for

EATC and would provide charter flying services through EATC for PrimeCare Clinics in

Bismarck.  Beginning in May or June of 2001, the PrimeCare Clinics became dissatisfied with

EATC and contracted directly with Sauter as an independent contractor for the provision of

pilot services.  The PrimeCare Clinics provided their own aircraft, which they leased from OSM.

The PrimeCare Clinics store their two leased aircraft in Bismarck owned hangars at the BMA.

Beginning in January or February of 2005, AMS began providing the pilot services to the PrimeCare Clinics and Sauter has worked as an independent contractor for AMS in providing pilot services since that time. The pilots provided by AMS continue to fly aircraft leased by the PrimeCare Clinics from OMS.

**J.    COOK LEASING**.

Cook Leasing, Inc. (Cook Leasing) is a corporation organized under the laws of the State of North Dakota and is solely owned by Maurice Cook. Cook Leasing is a single service provider and leases aircraft it owns through private party contracts to the general public at the BMA. Cook Leasing does not provide air charter, air taxi or any other air transportation service. Cook Leasing does not hold a FAR Part 135 certificate.

Since February of 2002, Cook Leasing has owned a Cessna aircraft. Cook Leasing formerly owned a Seneca aircraft, which it sold in 2001. Cook Leasing rents hangar space from Simson Investment to store its aircraft. It has also rented hangar space from Bismarck and purchased fuel from Bismarck.

Cook Leasing's private party leases prohibit its aircraft from being used in a charter operation. Those who lease Cook Leasing's aircraft must either pilot the aircraft themselves (if they are qualified to do so), or, at their expense, engage a pilot (who must also be qualified to fly the aircraft). Any pilot so engaged is not a party to the lease between Cook Leasing and the lessee.

Pilots privately engaged by lessees of aircraft owned by Cook Leasing may be employees of EATC, one of the defendants in this action, or of any entity not a party to this litigation. Cook Leasing's only requirement is that all pilots flying its aircraft must meet the minimum

requirements under its insurance policies.  Cook Leasing neither hires pilots, nor recommends to

aircraft lessees whom, if anyone, should be hired to pilot the aircraft.

Cook Leasing has its aircraft maintained by AMS.  In the past Cook Leasing has had

repair work done on its aircraft by EATC and has paid EATC for service it provided to the

aircraft.  Cook Leasing has rented hangar space from Bismarck and from Simson Investment.

Cook Leasing has its aircraft maintained by AMS.  AMS provides pilot services at the BMA and

occasionally contracts to provide pilots to fly aircraft owned by Cook Leasing.  AMS is a Part 91

operator and does not hold a Part 135 certificate.

## II.    STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when, viewed in a light most

favorable to the non-moving party, there are no genuine issues of material fact and the moving

party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Graning v. Sherburne

County, 172 F.3d 611, 614 (8th Cir. 1999).  A fact is "material" if it might affect the outcome of

the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir.

1996).  The moving party has the initial burden of demonstrating to the Court that there are no

genuine issues of material fact.  If the moving party has met this burden, the non-moving party

cannot simply rest on the mere denials or allegations in the pleadings.  Instead, the non-moving

party must set forth specific facts showing that there are genuine issues for trial.  Fed.R.Civ.P. 56(e).  A mere trace of evidence supporting the non-movant's position is insufficient.  Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.    ANALYSIS

EATC's basic assertion in this lawsuit is that Bismarck discriminated against EATC by not holding other businesses operating at the BMA to the same standards as EATC.  This discrimination is alleged in the form of equal protection and due process violations.  EATC claims this discrimination resulted in lost revenues and diminution in company value.  EATC further alleges that the private party defendants conspired with Bismarck to discriminate against EATC.

### A.    MINIMUM STANDARDS

Although not constituting a separate claim for relief the issue of minimum standards is important to the analysis of this case.  Regardless of the standards, the central question is whether Bismarck applied them equally.  The phrase minimum standards, as used by the parties, refers to guidelines which airport administrators typically promulgate in order to govern the provision of aeronautical services.  Such guidelines are referred to as "minimum standards" as they set the lower limit of facilities and services which businesses are required to offer to the public.

Prior to December 14, 2004, when the current minimum standards were enacted, there were no formal minimum standards in place at the BMA.  The FAA did not require the adoption of minimum standards but highly recommended their adoption as a means of fostering its policy

which prohibited exclusive rights. <u>See</u> FAA Advisory Circular No. 150/5190-5 (Circular 150/5190-5).  Circular 150/5190-5, which is dated June 10, 2002, provided airport sponsors with guidance in the adoption of minimum standards and urged their fair and reasonable application to all on-airport businesses.  Minimum standards are defined in Circular 150/1590-5 as follows:

> The qualifications or criteria that may be established by an airport owner as the minimum requirements that must be met by businesses engaged in on-airport aeronautical activities for the right to conduct those activities.

At all relevant times during the course of EATC's operations at the BMA there was in place Bismarck Municipal Code § 10-08-07, which states as follows:

> A person may not engage in any commercial aeronautical activity on the airport without the written approval, and under the standards prescribed by, the airport manager.  For the purposes of this part, a commercial aeronautical activity includes any activity which involves, makes possible, or is required for the safety of such operations.  All standards required for any commercial aeronautical activity will be on file in the Airport Managers Office.

By its terms this ordinance assumes standards will be prescribed by the airport manager but the ordinance does not require that standards be adopted.  EATC places great importance on the ordinance's requirement of written approval of commercial activity.  EATC also points to the standards specified in tenant leases as a measure of whether EATC was treated differently than other tenants.

More important than what the standards may have been is whether EATC was treated differently and if so whether that different treatment was justified.

### B.     EQUAL PROTECTION

The Fourteenth Amendment to the United States Constitution declares that no State shall deny any person the equal protection of the law. U.S. Const. Amend XIV, § 1.  The Equal Protection Clause mandates that government treat all similarly situated persons alike. <u>Barstad v.</u>

Murray County, 420 F.3d 880, 884 (8th Cir. 2005). In cases such as the one at hand where the plaintiff does not allege membership in a protected class, the plaintiff may sustain its Equal Protection claim by demonstrating it was (1) intentionally treated differently than others similarly situated, and (2) showing that there was no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(recognizing a "class of one" Equal Protection cause of action). In recognizing a "class of one" Equal Protection cause of action the Supreme Court pointed out that the purpose in doing so was to further "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution." Village of Willowbrook, 528 U.S. at 564.

### 1.    Similarly Situated

The initial inquiry in any Equal Protection claim is whether the plaintiff is similarly situated to those persons who allegedly received favorable treatment. Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996). Absent such a showing a plaintiff does not have an actionable Equal Protection claim. Id. The meaning of "similarly situated" is not easily defined. When analyzing whether two groups are similarly situated the groups must be similarly situated "in all relevant respects." Carter v. Arkansas, 392 F.3d 965, 969 (8th Cir. 2004). The groups must be similarly situated for the purposes of the challenged government action. Id.

The defendants argue EATC and the private party defendants are not similarly situated because EATC is a full-service FBO and the private party defendants are limited service providers. EATC argues that the two groups are similarly situated because under § 10-08-07 of

24

the Bismarck Municipal Code they are all persons engaged in aeronautical activity.  EATC also point out § 10-08-07 does not mention full service or limited service providers.

The question becomes whether a full service provider and a limited service provider are similarly situated "in all relevant respects?"  The only distinction that can be found here is that EATC offers a full range of aeronautical services and the private party defendants offer one or two aeronautical services.  Section 10-08-07 does not differentiate between the two statuses in any respect whatsoever.  The new minimum standards do differentiate but that difference is really only in the selling of fuel.  So what is the relevant respect to which the Court should look in answering the similarly situated question?  The Court concludes it is not the number of aeronautical services the enterprise offers or whether the enterprise sells aviation fuel but whether the enterprise provides aeronautical services.  Whatever the size of the operation, they are competitors.  And it is the provision of commercial aeronautical services that makes the enterprise subject to the authority of the Airport Operations Manager and § 10-08-07.  While the Court suspects that one must almost adopt the plaintiff's conspiracy theory to reach "similarly situated" status, the ultimate result id the same.

## 2.    Different Treatment/Rational Basis

### i.    Predatory Pricing

EATC alleges Bismarck has engaged in predatory pricing of aviation fuel at the BMA. The alleged predatory pricing included the offering of fuel price discounts to customers in an attempt to solicit fuel sales.  EATC points to the grant of "Signatory Air Carrier" status to some customers in furtherance of its argument.  Signatory Air Carrier status means the customer is charged a $.03 per gallon fuel flowage rate rather than $.05 per gallon.  EATC argues Bismarck

does not have the authority to create this special status. This disagreement is longstanding. In November of 1993, Rohlfs complained in a letter to the Mayor of Bismarck, that the City of Bismarck was selling fuel with no regard to profitability. EATC's market share of total fuel sales at the BMA has increased from 13.7% in 1991 to 43.5% in 2005.

Predatory pricing claims are generally brought in the context of federal anti-trust lawsuits. See National Parcel Services, Inc. v. J.B. Hunt Logistic, Inc., 150 F.3d 970 (8th Cir. 1998). EATC has not done this. EATC has not drawn the Court's attention to any caselaw addressing a predatory pricing claim in the context of a claimed equal protection violation. Bismarck states it has been unable to find any such caselaw and the Court's own research has not disclosed any either.

Bismarck and EATC are the only sellers of aviation fuel at the BMA. One of the requirements of an equal protection challenge is that the plaintiff has been treated differently than others similarly situated. The private party defendants are not similarly situated to EATC with regard to fuel sales as they do not sell fuel. EATC'a argument with regard to the fuel flowage fee is disingenuous at best given it did not collect the $.05 fee from certain customers it arbitrarily deemed to be "certificated scheduled airlines."[2] There is no evidence Bismarck sold fuel below cost. The Court concludes that allegations of predatory pricing do not support an equal protection claim.

---

[2]This issue has been more fully discussed in a separate order dealing with EATC's motion for summary judgment as to Bismarck's counterclaim.

ii.        **Referral of Aircraft Hangar Space**

EATC alleges Bismarck refers aircraft hangar customers to Simson Investment but never gives referrals to EATC.  In addition, EATC alleges Bismarck, Simson, and AMS have offered packaged services and products to customers at the BMA.  Simson occasionally rents hangar space to Bismarck for the storage of Bismarck customers' aircraft.  Bismarck denies making any referrals.

Assuming EATC has been treated differently with regard to hangar referrals, Bismarck has a legitimate reason for doing so.  Bismarck and EATC are competitors for the sale of fuel.  Bismarck seeks to protect its revenues generated from fuel sales.  See Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 825 F.2d 367, 373 (11ᵗʰ Cir. 1978)(stating revenue raising is a legitimate governmental objective); Park Shuttle N Fly, Inc. v. Norfolk Airport Auth., 352 F.Supp.2d 688, 698 (E.D. Va. 2004)(finding airport authority had a legitimate interest in protecting a source of income).  Economic competition and Bismarck's desire to protect its fuel sales revenues are a rational basis for treating EATC differently than the limited service providers.

Bismarck would likely lose fuel sales if it made referrals to EATC.  Simson does not sell fuel.  There is little question that EATC would attempt to sell fuel to any person for whom it was providing hangar space.  This would make sense.  That Bismarck would not make hangar referrals to EATC also makes sense.  The Court concludes that if Bismarck in fact refused to make referrals for hangar services to EATC it had a rational basis for doing so.

### iii.    Referral of Aircraft Maintenance

EATC alleges Bismarck has improperly made referrals of aircraft maintenance customers to AMS and Simson Investment.  According to Bismarck, its policy is to simply advise prospective maintenance customers of the identities of those service providers at the BMA who provide maintenance service and to let the customers decide.  Bismarck charges EATC has offered and paid referral fees to get new customers for maintenance work at the BMA and that EATC pays its employees a bonus based upon the number of gallons of fuel sold.

EATC employees George Burfield (Burfield), Justin Weninger (Weninger) and Trevor Meidinger (Meidinger) allege Bismarck flightline employee Bill Montgomery (Montgomery) told them in late 2003 or early 2004 that he could get a $10 referral fee for referring mechanic work to Mike Aarestad.  Bismarck flightline employee, Curt Kraft, another who was allegedly present during at least one of these conversations, denies Montgomery, or anyone else, said anything about getting $10 for referring mechanic work to Mike Aarestad.  Burfield, Weninger, and Meidinger all admit that Montgomery did not acknowledge actually accepting any money from or being paid by Aarestad.  Burfield, Weninger, and Meidinger all state that they have no knowledge of anyone at Bismarck accepting any money from Aarestad (AMS) or being paid by Aarestad(AMS) for referrals.

Bill Montgomery denies making the statements attributed to him by EATC employees and denies ever being offered or accepting any payment by Aarestad.  Mike Aarestad and Robert Simmers, owners of AMS, deny offering anyone a $10 payment for referrals of maintenance work to them.

There is a clear factual dispute over whether Bismarck treated EATC differently in the referral of maintenance services.  The reason for the lack of referrals put forward by Bismarck is the same as the referral of hangaring services: EATC and Bismarck are competitors for fuel sales and Bismarck will lose out on fuel sales if it makes referrals to EATC.  As it did with the hangaring services issue, the Court accepts this competition argument as a rational basis for the lack of any referrals.

### iv.    Vehicle Signage

EATC alleges Bismarck allowed AMS and persons not authorized by Bismarck to operate a vehicles on the BMA ramp with improper lighting and signage.  The vehicle in question was a Suburban operated by Aarestad's minor son who drove the vehicle from AMS's hangar to the Bismarck terminal building.  Shortly after being advised by EATC of the violation of the signage requirement Bismarck discussed the matter with AMS and appropriate identifying information was placed on the motor vehicle at issue.

The ramp access/vehicle signage issue was a onetime incident that was immediately corrected.  EATC cites no other incidents in which proper lighting and/or signage were not used.  A one-time incident hardly supports EATC's argument that Bismarck knowingly "allowed" AMS to operate its vehicles on the BMA without proper lighting or signage.  There is no evidence EATC has been treated differently in this respect.  This incident, along with several others, illustrates the "de minimis" nature of the complaints.

### v.    Charter Services

EATC alleges Bismarck has knowingly permitted defendants AMS, Fetch, Sauter, Scherr/Onstar, and Cook Leasing to provide what EATC alleges are quasi charter services at the

BMA.  Specifically, EATC alleges when you combine the pilot only services provided by Fetch, Sauter, and AMS with the provision of aircraft only services by OSM and Cook Leasing, you end up with an aircraft charter service.  EATC charges this quasi charter service directly competes with EATC's air charter business.  EATC also alleges Scherr uses Bismarck's arrival and departure building and conducts his business without a written lease agreement or a facility on the airport.

Air charter services must obtain Part 135 certification from the FAA.  The determination of whether a service needs or qualifies for a Part 135 certificate is made by the FAA.  Bismarck does not actively investigate whether aviation service providers at the BMA are Part 135 or Part 91 operators.  It is up to the FAA to enforce its regulations and it is the duty of aviation service providers to comply with FAA regulations.  Both Fetch and Scherr/Onstar have been assessed civil penalties by the FAA for conducting Part 135 operations without the proper certification.

Somehow EATC faults Bismarck for allowing this to happen.  The Court agrees with Bismarck that Bismarck has no control over who obtains Part 135 certification from the FAA.  This argument does not support an equal protection claim.  Bismarck has no control over Part 135 certifications and thus did not treat anyone differently in this respect.

### vi.    Advertising

EATC alleges Bismarck discriminated against EATC by allegedly permitting Fetch to place a one page letter size advertisement for his flight instruction service on a BMA bulletin board without permitting EATC to do the same.  This occurred in August of 2003.  The advertisement was removed shortly after Bismarck became aware of its presence.  Bismarck

points out that on another occasion EATC was allowed to place a sign on BMA property advertising flying services. This ad was in place for approximately six weeks.

Fetch's ad was up for a short period time and taken down when Bismarck became aware of it. The lack of prior approval and quick action in removing the advertisement demonstrate Bismarck did not have a practice of allowing EATC's competitors to advertise on Bismarck's property while not allowing EATC to do so. EATC has come forth with no other instances of allegedly discriminatory advertising practices. EATC has not shown that it was treated differently in this regard and any difference would seem to be de minimis.

### vii.    Differing Lease Terms

EATC argues it was treated differently by being forced to accept harsher lease terms than those businesses that came along afterwards. Differences in lease terms are to be expected given no two parcels of property are alike. The differing needs of each service provider and their differing usage of the BMA also lead to differing lease terms. The needs of the airport itself change over time as well. There can be no rational expectation every lease entered into by Bismarck concerning the BMA over a thirty year period will be identical. EATC accepted the terms of its lease in 1976. It seems to argue that every other service provider that has come along since that time should have been forced to accept a lease identical to EATC's lease. This is illogical and would not have allowed for any limited service providers at the BMA. FAA guidelines prohibit airport operators from requiring limited service providers to provide all the services offered by full service providers. See FAA Advisory Circular AC 150/5190-5. Bismarck acted rationally in allowing both full service and limited service providers to conduct business at the BMA.

31

### viii.    Use of Existing Pavement by Simson Investment

EATC alleges that Bismarck, by allowing Simson Investment to utilize existing pavement in its hangar construction gave Simson Investment an unfair advantage over EATC as EATC had to pay the costs of concrete for its floor.  Pursuant to the Simson 1990 Lease, Bismarck agreed Simson Investment could use existing pavement located at the site for use as the hangar floor.  This existing pavement was comprised of an old runway which had not been used for many years prior to Simson Investment's lease of the property.  Pursuant to the lease, once construction of the hangar began, pavement maintenance and repairs on the site became the responsibility of Simson Investment.  Simson Investment ultimately removed the pavement at its expense when a new concrete floor was installed in the hangar.  The terms of the lease were a benefit to Bismarck as it did not have to remove the old pavement and Simson paid for its replacement.

The "differences" in treatment regarding the pavement that EATC complains of are easily explainable and certainly rational when the differing nature of particular pieces of property and the needs of the business and the BMA are taken into account.  Bismarck has acted with a rational basis in this regard.

### ix.    Towing Services

EATC alleges the towing of aircraft by Bismarck for Simson and/or AMS at a flat monthly rate constitutes economic discrimination because Bismarck refuses to do so for EATC. The reason given by Bismarck for this is that EATC and Bismarck compete for fuel sales and it is likely customers towed for EATC would be fueled by EATC.  Bismarck receives additional economic benefit from towing aircraft for Simson Investment and/or AMS customers in the form

of potential fuel sales to Simson Investment and/or AMS customers. Fuel sales constitute 73% of Bismarck's flightline revenues. EATC points out that Bismarck and Simson Investment compete for aircraft storage. However, Bismarck and EATC also compete for aircraft storage business.

Bismarck's aircraft storage revenues are far smaller than its fuel sales revenues. That Bismarck has chosen to provide towing services to AMS and not to EATC in order enhance its fuel sales, which account for the majority of its revenues, is understandable. Such competition is not unlawful and constitutes a rational basis for Bismarck's actions.

## C.    DUE PROCESS

The Fourteenth Amendment to the United States Constitution states that no state shall "deprive any person of...property, without due process of law." U.S. Const. amend. XIV, § 1. EATC does not allege a procedural due process violation. Rather, EATC is claiming a substantive due process violation. The first consideration when analyzing an alleged substantive due process violation is whether the plaintiff possesses a protected property right. Creason v. City of Washington, 435 F.3d 820, 824 (8th Cir. 2006). The second consideration is whether the government's conduct deprived the plaintiff of that protected property right. Id. To satisfy the second requirement the plaintiff must show the government action was truly irrational and not simply arbitrary or capricious. Id.

The constitutionally protected property interest EATC claims it has been deprived of is a diminution of value in its leasehold, hangars, buildings, and a loss of profits. The Supreme Court has determined that "business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense" and thus is not a property interest

33

protected by the due process clause. <u>College Savings Bank v. Florida Prepaid Postsecondary</u>

<u>Educ. Expense Board</u>, 527 U.S. § 666, 675 (1999).  Business assets are property protected by the

due process clause and any taking of those assets is a prohibited deprivation. <u>Id.</u>  A leasehold is

also a protected property interest. <u>Dept. of Housing and Urban Dev. v. Rucker</u>, 535 U.S. 125,

135 (2002).

 Bismarck argues EATC has not been deprived of any interest in its leasehold.  The

original 1976 lease, including the ten year extension, expired on December 31, 2005.  EATC is

now operating under a one year lease that will expire December 31, 2006.  As the original 1976

lease has expired, there can be no claim of a deprivation of that leasehold.  Nor has EATC been

deprived of its current one year lease.

 Thus, the question becomes whether Bismarck had a rational basis for the alleged

deprivation to EATC's business assets.  EATC has not explained how any of the allegations of

different treatment negatively affected the value of its hangars and buildings.  The fact that

Rohlfs was able to sell EATC, and its assets, for a substantial sum negates any claim of complete

deprivation.  The Court fully addressed each of the alleged instances of different treatment under

in its equal protection analysis above and found that a rational basis, business competition,

existed for any possible different treatment.

  **D. NORTH DAKOTA CONSTITUTIONAL CLAIMS**

 EATC has brought supplemental state claims for alleged violations of Article I § 21 and

Article XII § 16 of the North Dakota Constitution.  Pursuant to 28 U.S.C. § 1367, in any civil

action in which a district court has original jurisdiction, it shall also have supplemental

jurisdiction over all other claims so related to the claims in the original jurisdiction that form part

of the same case or controversy.  Once claims over which a district court has original jurisdiction

are dismissed, it is left to the court's discretion whether to exercise supplemental jurisdiction.  28

U.S.C. § 1367(c)(3).

The Eighth Circuit has repeatedly said that "when state and federal claims are joined and

all federal claims are dismissed on a motion for summary judgment, the state claims are

ordinarily dismissed without prejudice to avoid needless decisions of state law . . . as a matter of

comity."  Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000);  ACLU v. City of Florissant, 186

F.3d 1095, 1098-99 (8th Cir. 1999).

EATC's state constitutional claims will be dismissed without prejudice.

E.    STATE ACTOR/CONSPIRACY

Although not absolutely necessary to the resolution of the summary judgment motions,

the Court will address this issue.

The private party defendants (all the defendants other than Bismarck) in this case argue

EATC has no evidence that the private party defendants conspired with Bismarck to violate

EATC's civil rights and that for this reason they should be granted summary judgment.

Only state actors may be held liable under Section 1983. Youngblood v. Hy-Vee Food

Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001).  However, a private party may be held liable

under section 1983 if he or she willfully participates in joint activity with the State or its agents.

Id.  The burden is on the plaintiff to show the private party defendant's willful participation in

the joint activity deprived the plaintiff of a constitutional right. Murray v. Wal-Mart, 874 F.2d

555, 558 (8th Cir. 1989).  In order to defeat a summary judgment motion on the existence of such

a conspiracy a plaintiff must offer evidence that would establish a mutual understanding or a meeting of the minds. DuBose v. Kelly, 187 F.3d 999, 1003 (8th Cir. 1999).

EATC offers the following evidence of conspiracy between the private party defendants and Bismarck.

1. The creation of a de facto FBO by Bismarck and the private party defendants.

2. Selective treatment of the private party defendants by Bismarck in the provision of towing services, referrals, vehicle signage requirements, and the operation of quasi charter services by .

3. Selective treatment of Simson Investment by its lease terms.

EATC argues that the defendants are essentially a de facto FBO as the services offered by the defendants, when aggregated, approximate the services offered by EATC. It may well be true that were the private party defendants to combine their operations in one company, they would then constitute a full service FBO rather than a number of limited service providers. EATC offers no caselaw to support the argument that a de facto FBO evidences a conspiracy. The Court fails to understand how this constitutes evidence of a conspiracy, especially when one considers this case arises in a commercial context.

EATC states that Simson Investment received selective treatment in that its lease terms were more favorable than EATC's. This is proffered as evidence of conspiracy. Yet when the argument is more closely examined EATC admits Simson Investment pays more rent per square foot than EATC. The issue of the underlying pavement, which the Court addressed in analyzing the Equal protection claim, does not support EATC's theory. There is no evidence cited by

EATC that suggests that the private party defendants were even aware of the terms of EATC's 1976 lease.  This supposed evidence of conspiracy is wholly unsubstantiated.

Much of EATC's argument centers on the claim that the private party defendants not being required to have written permission to operate their respective businesses at the BMA as required by municipal ordinance.  The Court fails to see the importance of this.  Clearly the private party defendants operated with the consent of Bismarck.  That the permission was not reduced to writing is not evidence of a conspiracy.  What harm this lack of a writing caused EATC is unknown.  How this lack of a writing gave advantage to the private party defendants is also unknown.  Bismarck Municipal Code § 10-08-07  does not require the payment of a fee in order to obtain permission to operate at the BMA.  All this ordinance requires is compliance with standards promulgated by the airport manager.  No standards were enacted until 2004.  The lack of a writing may be evidence of selective enforcement as to EATC by Bismarck but the Court does not see it as evidence of a meeting of the minds between Bismarck and the private party defendants.  See Jetstream Aero Services, Inc. v. New Hanover County, 884 F.2d 1388 (4th Cir. 1989)(unpublished opinion)(addressing § 1983 selective enforcement action).  In Jetstream the Fourth Circuit Court of Appeals found that the simple fact that private party defendants benefitted from selective enforcement of state and local ordinances at a county airport did not evidence a conspiracy. Id.  Speculation was insufficient to survive summary judgment. Id.

Assuming EATC's examples of different treatment are true, they do not support the theory that the private party defendants conspired with Bismarck.  There must be more than the simple fact, which is hotly contested, that Bismarck treated EATC differently or gave the private party defendants preferential treatment to support a conclusion that EATC's competitors

conspired with Bismarck to have EATC treated differently.  Benefit may have accrued but there is no evidence of conspiracy.

EATC has submitted no direct evidence that a conspiracy existed between the private party defendants and Bismarck to violate EATC's rights.  Nothing cited by EATC as evidencing a conspiracy is out of the ordinary for a business competitor.  The private party defendants and EATC are economic competitors, as are EATC and Bismarck.  Competition is not illegal.  Nor is it evidence of unlawful conspiracy.  EATC's argument regarding a conspiracy amounts to nothing more than mere speculation.

### F.    RECONSIDERATION

The defendants invite the Court to reconsider its order dated July 29, 2004, addressing the statute of limitations issue and the res judicata and collateral estoppel issues.  Although the Court believes these issues are subject to reasonable debate it has not been convinced its previous order was in error.

### G.    SANCTIONS

Cook Leasing has filed a separate motion requesting Rule 11 sanctions and an award of attorneys's fees.  Rule 11(b) provides as follows:

(b) **Representations to Court**. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

38

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

The use of Rule 11 sanctions for the filing of a frivolous complaint is rare. The Court has previously denied Cook Leasing's Rule 12 motion to dismiss. A legal basis for the claims certainly existed if the conspiracy could have been proven. The factual basis for the claims against Cook Leasing is thin and although this Order grants summary judgment in favor of Cook Leasing, the Court does not find EATC's allegations to be so baseless as to warrant Rule 11 sanctions. The granting of summary judgment is sufficient sanction.

## IV.    CONCLUSION

Hopefully the personal animosities between Rohlfs and the defendants which fueled this lawsuit will be extinguished by the recent sale and the conclusion of this lawsuit.

For the reasons explained above, the defendants' motions for summary judgment are **GRANTED.** All claims are dismissed with prejudice save for the state constitutional claims which are dismissed without prejudice. Cook Leasing's motion for sanctions is **DENIED**. Let Judgment be entered accordingly.

**IT IS SO ORDERED**.

Dated this 30th day of August, 2006.

/s/ *Patrick A. Conmy*
                Patrick A. Conmy, Senior District Judge
                        United States District Court